**James Dale LEE, Appellee,**

v.

**Donna Lynn LEE, Appellant.**

**No. 51475.**

Court of Appeals of Oklahoma, Division 2.

April 18, 1978.

Released for Publication by Order of Court of Appeals May 11, 1978.

Bert McElroy, Kurt A. Ray, Sanders, McElroy & Carpenter, Tulsa, for appellee.

Mark O. Thurston, Garrison, Pigman, Comstock & Thurston, Tulsa, for appellant.

BRIGHTMIRE, Judge.

Challenged here is the propriety of the trial court's modification of a Nebraska decree dividing custody of a three-year-old boy annually between his father who lives in Tulsa and his mother who lives in Texas.

## I

The little fellow, Christopher Dale Lee, was born February 26, 1974. Three years earlier his father had married his mother at the age of 17. When he was 19 the father enlisted in the U.S. Air Force and served in California, Texas, Okinawa, Japan and finally Nebraska. Not long after the parties arrived in Nebraska the mother, Donna Lynn, advised the father that because he "was getting older, and she was getting younger" she was leaving him to live with an 18-year-old man named Christopher Callis. So she moved out leaving the infant in the custody of his father.

A divorce action followed and at the close of a two-day trial the Nebraska court, after granting the father a divorce, found both parties to be "fit and proper" custodians of Christopher and concluded that the child's "best interests would be served" by placing his custody in the father during even numbered years beginning August 1, 1976 and in the mother during odd numbered years thereafter. The father was granted permission to remove the child to Oklahoma and the mother permission to take the child to Texas during her entitlement to his "physical possession."[1] This was in March 1977. Not long after that the father was released from the service and moved with his young son to Tulsa. The mother later moved to Texas where she lived with her parents. She said she had visited with her child a couple of times and called him on the telephone about once a week after he and his father moved to Tulsa in early April 1977. When this matter was heard on September 7 and 8, 1977 the mother testified that she and her Nebraska paramour planned to get married "the middle of the next month." Callis, she added, was acquainted with her boy and when asked whether her "fiance" had made plans to

take the youngster into his home she replied, "he can't wait."

A Tulsa clinical psychologist who during nine years of practice acquired considerable experience analyzing children from the standpoint "of their adjustments, their personality traits, and things like that," testified that she had seen and examined young Christopher on July 8 and 13, 1977. The purpose of this "was to help determine whether it would be advantageous for Christopher to remain living with his father or to spend one year living with his mother and then alternating back and forth."

To help her evaluate the child's ability to cope with such an annual total change of domestic environment contemplated by the Nebraska decree, the psychologist obtained appropriate background information, talked to the youngster, observed him in a "free play situation," and gave him some relevant psychological tests. She found Christopher to be "an alert, energetic, above average in intelligence youngster who takes initiative and expresses curiosity, who is not too passive . . . not difficult to control, [and] he will take suggestions and directions." She determined also that the boy enjoyed "a very comfortable, natural relationship with his father" and this was important because such a relationship with a parent figure gives a youngster a feeling of security and trust—a necessary foundation for successfully meeting the challenges offered by the world at large. Having once established such a relationship the psychologist opined that to abruptly deprive the child of it would be to subject him to a feeling of insecurity and a serious risk of maladjustment with "some pretty severe consequences." And, she added, "I think the switching would be dangerous to—be taking a risk as to what the emotional results might be . . . I have a very definite

---

1. After announcing his divided custody decree the Nebraska judge said in substance that such an arrangement "would not work indefinitely" and since both parties were leaving Nebraska they would have to make some new arrangements for themselves adding that they both could "see that this is not a suitable situation or arrangement."

The Oklahoma trial judge's reaction to the decree was something less than enthusiastic. She viewed it as one reluctantly made by a "judge who didn't want to make a decision," and therefore entitled to little consideration.

opinion that it would be better for him to remain with his father."

## II

The appealing mother argues first of all that the trial court should not have modified the Nebraska decree because there was no competent evidence "that there had been a sufficient change of conditions so as to prejudice the welfare of the child in the custody of its mother."

■ Shortly after the trial court decided this case the Oklahoma Supreme Court handed down a decision in *Grubbs v. Hunter*, Okl., 573 P.2d 699 (1977) which reaffirms principles we believe to be decisively relevant to the case at bar. One of them is that the courts of this state are bound by the doctrine of comity not to relitigate a child custody controversy resolved by another state "unless the welfare of the child is in jeopardy or some other unusual circumstance exists." So the determinative question is reduced to this—is there evidence indicating either that enforcement of the Nebraska order would jeopardize young Christopher's welfare, or that the circumstances are sufficiently unusual to justify the Oklahoma court's intervention and modification of the Nebraska order?

■ In our opinion both criteria are present. Admittedly the annual custodial division is in itself unusual. Although the high court of this state has on occasion approved divided custody it has, in each instance, been for reasonable periods such as nine school months in one parent and three summer recess months in the other. Certainly it is unusual, to say the least, to order a child to be completely uprooted for a year annually. Another unusual circumstance is that these parties were in Nebraska because of the father's military requirements and at the time the divorce was granted both parties had already decided to leave Nebraska and live in two other states. The Nebraska judge recognized not only that the decree would likely be modified later but anticipated that it would be done in another jurisdiction.

Besides the existence of unusual circumstances we think there is evidence sufficient to support a finding that the child's welfare would have been placed in jeopardy had the trial court removed the child from the father's custody under the circumstances. The term jeopardy, as used in *Grubbs* and its ancestry means to subject the child's welfare to a substantial risk of harm.[2]

As we mentioned earlier it was established through expert testimony that to remove the little boy from the comfortable and secure environment he now enjoys would jeopardize or endanger his well-being and incur the serious risk of emotional maladjustment.

While the trial judge did not state her reasons for the modification in detail there is no doubt it was motivated by a desire to protect Christopher from the jeopardous consequences of the Nebraska decree. We hold, therefore, that her order is not only permissible legally but consistent with the child's best interest.

Affirmed.

NEPTUNE, P. J., and BACON, J., concur.

---

2. Webster's New Twentieth Century Unabridged Dictionary 982 (2d ed. 1964) defines jeopardy as meaning "risk, danger, peril."